1   MARK GOLDROSEN, CBN 101731
    Attorney at Law
2   255 Kansas Street, Suite 340
    San Francisco, California 94103
3   TEL: (415) 565-9600
    FAX: (415) 565-9601
4   markgoldro@aol.com

5   Attorneys for Defendant
    JEREMIAH JEFFERSON
6

7                    UNITED STATES DISTRICT COURT

8                  NORTHERN DISTRICT OF CALIFORNIA

9                          OAKLAND DIVISION

10
    UNITED STATES OF AMERICA,          )      No. CR-20-000465-001 JST
11                                      )
                Plaintiff,              )
12                                      )      DEFENDANT JEFFERSON'S
                                        )      SENTENCING MEMORANDUM
13        vs.                           )
                                        )
14  JEREMIAH JEFFERSON,                 )
                                        )
15              Defendant.              )
                                        )      DATE: December 10, 2021
16                                      )      TIME: 9:30 a.m.
    _____)      DEPT: Hon. Jon S. Tigar
17

18        Defendant JEREMIAH JEFFERSON, remorsefully appears before this honorable

19  Court for sentencing after having pled guilty to the sole charge contained in the Information.

20  Mr. Jefferson respectfully requests that the Court sentence him to time served (30 days in

21  Santa Rita Jail), followed by three years of supervised release with electronic home

22  monitoring for one year and other conditions recommended in the Presentence Investigation

23  Report (hereafter "PSR"). As explained below and in the PSR, there are numerous mitigating

24  circumstances warranting a downward variance from the applicable Guidelines range,

25  including Mr. Jefferson's youth, intellectual disabilities, family instability, and efforts to

26  maintain employment.

27  **I.    MR. JEFFERSON'S BACKGROUND**

28        Mr. Jefferson, now 24 years old, was born in Chico, California. He currently lives

with his mother in Seattle and works at a Target warehouse through a temporary employment agency.

### A.   Family Turmoil

Childhood and adolescence presented Mr. Jefferson with a number of challenges. For one,  his home life was unstable. His parents separated when he was eight months old. Mr. Jefferson went to live with his mother, with occasional visits with his father. Mr. Jefferson's mother struggled to provide for the family. At times, they relied on food and donations from the Salvation Army. They moved homes frequently because Mr. Jefferson's mother could not afford to pay the rents. Once, after Mr. Jefferson's mother lost her job, the family was homeless and had to live with the maternal grandmother and in hotels. PSR at ¶¶ 45-46.

Ms. Jefferson's mother had a number of boyfriends who were abusive to her while Mr. Jefferson was a child. On one occasion, Mr. Jefferson's mother was hospitalized due to her injuries. In addition, his mother's boyfriends sexually abused both of Mr. Jefferson's sisters. *Id*. at ¶ 46. Mr. Jefferson participated in family therapy between the ages of three to six in order to cope with the domestic violence in his home. *Id*. at ¶ 53.

Mr. Jefferson lived with his mother in various residences in Chico, Orland, and Sacramento. When Mr. Jefferson was 15, he moved to San Francisco to live with his father, so that his father could teach him "how to be a man." *Id*. at ¶ 47.

### B.   Intellectual Disabilities and Depression

Other significant challenges Mr. Jefferson faced while growing up resulted from his intellectual disabilities. When Mr. Jefferson was a small child he struck his head after falling and then had a grand a mal seizure that lasted over five minutes. Following this and later seizures, Mr. Jefferson "had to learn all over again the basic life skills and still had some medical problems." Letter from Jasmine Jackson-Ray, attached asa Exhibit A. It was also believed that Mr. Jefferson's seizures were the cause of his later intellectual difficulties, speech impediments, and memory problems. *Id*. at ¶ 52.

Because of his intellectual impairments, Mr. Jefferson began receiving SSI disability

1  payments when he was only four years old. In March 2016, the payments were suspended

2  after Mr. Jefferson was reevaluated. However, in the spring of 2017, the payments resumed

3  after he was again found to be disabled.

4          Mr. Jefferson was also found eligible for special education services beginning in 2003

5  when he was six years old. He continued to receive these services until his graduation from

6  high school. Eleventh grade testing indicated Mr. Jefferson had a Mild to Moderate

7  Receptive and Mild to Moderate Expressive Language Disorder and that he continued to

8  meet the eligibility criteria for a student with a speech/language disability as defined by the

9  Individuals with Disabilities Education Act. A 2016 report stated that Mr. Jefferson's scores

10 in the areas of Broad Reading, Basic Reading Skills, Reading Comprehension, Math

11 Calculation Skills, Math Reasoning and Brief Mathematics were very low when compared

12 to those of his peers. PSR at ¶ 56.

13         In addition, Mr. Jefferson scored very low in IQ testing. In 2015, his Full Scale IQ

14 was found to be 63 and in 20017 it was 57. Based on these scores, he was diagnosed as

15 suffering from "Intellectual Disability, Mild." He was also diagnosed as having "Persistent

16 Depressive Disorder, Early onset, With pure dysthymic syndrome, Moderate." *See*

17 Psychological Report of Sara Bowerman, Ph.D., attached as Exhibit B. A 2016 psychiatric

18 review further concluded that Mr. Jefferson has "significantly subaverage general intellectual

19 functioning with deficits in adaptive functioning initially manifested during the

20 developmental period." *See* Psychiatric Review Technique, attached as Exhibit C.

21         Finally, Mr. Jefferson was diagnosed with ADHD as a child. He was prescribed

22 Ritalin, but taken off of it due to negative side effects. *Id*. at ¶ 53.

23         **C.     Deaths of Close Friends and Family Members**

24         **A** string of difficult losses during his teenage years caused other challenges for Mr.

25 Jefferson. When he was 13, a close female friend died from an asthma attack. Approximately

26 two years later, another close friend was fatally shot in Sacramento. Then, when Mr.

27 Jefferson was17, his maternal grandmother passed away. This loss was especially difficult

28

1   for Mr. Jefferson because his grandmother was a strong source of support when his mother

2   had been unable provide for him and his siblings. Mr. Jefferson stopped attending school for

3   a few months while he attempted to cope with his grandmother's death. PSR at ¶ 48.  He also

4   experienced suicidal thoughts at various times, including this past year, caused by grieving

5   over the deaths of people close to him. PSR at ¶ 53. According to Mr. Jefferson's mother,

6   the loss of his grandmother and other family members also led to Mr. Jefferson "hanging out

7   with the wrong crowd" and "getting involved in a life of criminal activity." *See* Exhibit A.

8        **D.**    **Employment and Other Positive Adjustments**

9        It is noteworthy that following his arrest in this case, Mr. Jefferson spent 30 days in

10   Santa Rita Jail before he was released on December 17, 2020. While on pretrial release, Mr.

11   Jefferson has made significant efforts to maintain employment. *Id*. at ¶ 4. He worked at Zero

12   Groceries in Berkeley from January to March of 2021 and at Ghiradelli Chocolate in San

13   Leandro from June to July of 2021. After moving to Seattle to live with his mother, Mr.

14   Jefferson quickly obtained employment through a temporary staffing agency. He currently

15   works the graveyard shift at a Target warehouse. *Id*. at ¶ 58. Mr. Jefferson's strong work

16   ethic in the past year is not out of character for him. Prior to his arrest in this case, he worked

17   at series of jobs between 2016 and 2020, including at Tesla Motors in Fremont, Imperfect

18   Foods in San Francisco, UPS in San Francisco, Department of Public Works in San

19   Francisco, and Job Corp in San Francisco. *Id*. at ¶ 58.

20        Mr. Jefferson's mother has noticed positive changes in Mr. Jefferson in the recent

21   past. She writes:

22       Through hard work and counseling and being persistent[,] Jeremiah [s]lowly
    but surely started to change in his life and today he is not the same young man

23       from before that made bad choices. Jeremiah is now responsible, hard
    working, consistent and a Team player who is a fast learner.

24

25   *See* Exhibit A. She adds that since Mr. Jefferson joined her in Seattle, "[h]e has been working

26   everyday and will go in on his off days to work." He also "has been making new friends with

27   people who have business[es] or [are] career driven." Mr. Jefferson "has been much happier

28

1   since moving to Seattle," and "is looking into going back to school to get a degree in X-ray

2   technician." *Id*. Mr. Jefferson's friend, Mariyanna Bryant, notes in her letter, that Mr.

3   Jefferson has discussed his goals with her and that he is "striving hard to make sure those

4   goals are accomplished." Letter from Mariyanna D. Bryant, attached as Exhibit D.

5   **II.   CONNECTION BETWEEN FIREARM POSSESSED BY MR. JEFFERSON
        AND PRIOR SHOOTINGS**

6

7       Using the NIBIN database, agents connected the firearm seized from Mr. Jefferson's

8   car to shell casings recovered at recent shootings in Castro Valley and San Francisco. This

9   connection, however, does not reasonably lead to the conclusion that Mr. Jefferson was

10  involved in these shootings or that he knowingly associated and transferred firearms with the

11  person or persons who did the shootings.

12      Indeed, in the Castro Valley incident, the police identified someone other than Mr.

13  Jefferson as being one of the shooters. Moreover, none of the descriptions of the vehicles

14  involved in the incident matched the Infiniti sedan in which Mr. Jefferson was arrested. PSR

15  at ¶ 12. In the San Francisco incident, which preceded the Castro Valley shootings, the

16  shooter was in a car described by the victim as a black Infiniti sedan. While that description

17  generally matches the vehicle Mr. Jefferson was driving, the description is void of sufficient

18  details to draw any reasonable conclusion as to whether the vehicles were the same. In

19  addition, the victim was unable to provide any description of the persons inside the car from

20  which the shots were fired. *Id*.

21      Obviously, a firearm is readily transferable between persons. It cannot be assumed that

22  Mr. Jefferson received the firearm directly from a person involved in the prior shootings. Nor

23  can it be assumed that he would have known the firearm had been used in prior shootings

24  when he took possession of it. The connection of the firearm to the prior shootings leads only

25  to speculation, not to reasonable inferences about Mr. Jefferson's conduct and knowledge.

26  **III.   PLEA AGREEMENT**

27      Mr. Jefferson and the government entered into a written plea agreement pursuant to

28

1   Rules 11(c)(1)(A) and 11(c)(1)(B) of the Federal Rules of Criminal Procedure. Mr. Jefferson

2   pled guilty to Count One of the Information, charging him with Felon-in-Possession of a

3   Firearm, in violation of 18 U.S.C. § 922(g)(1). Paragraph 7 of the plea agreement allows Mr.

4   Jefferson to "to seek a downward variance based on the factors set forth in 18 U.S.C. §

5   3553(a)."

6   **IV.     PRESENTENCE INVESTIGATION REPORT (PSR)**

7          Mr. Jefferson has no outstanding objections to the PSR. The PSR calculates Mr.

8   Jefferson's total offense level to be 12 and his Criminal History Category to be VI. PSR at ¶¶

9   26 and 35. That results in a Guidelines range of 30 to 37 months. The PSR recommends that

10  the Court vary downward from the applicable Guidelines range and impose a sentence of 12

11  months imprisonment followed by three years of supervised release. *Id*., Sent. Rec. at 1. The

12  PSR points to a number of mitigating circumstances in support of its recommendation for a

13  downward variance. First, Mr. Jefferson's "criminal convictions occurred within

14  approximately a three-year span," and therefore "it may be reasoned that Criminal History

15  Category VI overstates the severity of Mr. Jefferson's criminal history." *Id*. at 2. Second, Mr.

16  Jefferson's "use of narcotics impaired his judgment such that it influenced his involvement

17  in the instant offense." *Id*. Third, in the almost one year Mr. Jefferson has been on pretrial

18  release, he "has . . . secured employment and worked toward re-establishing himself in the

19  Seattle area." *Id*. Fourth, Mr. Jefferson experienced "challenges during his upbringing,

20  including poverty, homelessness, and exposure to domestic violence." *Id*. Finally, Mr.

21  Jefferson has suffered from intellectual and learning disabilities since early childhood.

22         Mr. Jefferson agrees that a sentence below the applicable Guidelines range for offense

23  level 12 is appropriate, but believes that the mitigating circumstances justify an even greater

24  downward variance, as explained below.

25

26

27

28

1   **V.     MR. JEFFERSON RESPECTFULLY REQUESTS THAT HE BE SENTENCED
2            TO TIME SERVED (30 DAYS) FOLLOWED BY THREE YEARS OF
             SUPERVISED RELEASE WITH ELECTRONIC HOME MONITORING FOR
3            ONE YEAR AND OTHER CONDITIONS RECOMMENDED IN THE PSR**

4           In *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008), the Ninth Circuit

5   explained that,

6           The overarching statutory charge for a district court is to "impose a sentence
            sufficient, but not greater than necessary" to reflect the seriousness of the
7           offense, promote respect for the law, and provide just punishment; to afford
            adequate deterrence; to protect the public; and to provide the defendant with
8           needed educational or vocational training, medical care, or other correctional
            treatment.  18 U.S.C. § 3553(a) and (a)(2).

9

10          All sentencing proceedings are begun by the district court calculating the applicable

11  Guidelines Range. The district court then should consider the sentencing factors set forth in

12  section 3553(a) to determine if they support the sentence suggested by either of the parties.

13  *Carty*,  520 F.3d at 991. These factors include:

14          the nature and circumstances of the offense and the history and characteristics
            of the defendant; the need for the sentence imposed; the kinds of sentences
15          available; the kinds of sentence and the sentencing range established in the
            Guidelines; any pertinent policy statement issued by the Sentencing
16          Commission; the need to avoid unwarranted sentence disparities among
            defendants with similar records who have been found guilty of similar
17          conduct; and the need to provide restitution to any victims. 18 U.S.C. §
            3553(a)(1)-(7).

18

19  *Id*.

20          Here, as identified below and in the PSR, there are a myriad of sentencing factors that

21  support the sentence requested by Mr. Jefferson.

22          **A.     Remorse and Early Acceptance of Responsibility**

23          Mr. Jefferson pled guilty at an early stage of the proceedings, without litigating any

24  pretrial motions or setting a trial date. He expressed sincere remorse for his criminal conduct,

25  explaining that he "feel[s] stupid and embarrassed for [his] criminal conduct," and that he

26  "should have known better and made better decisions." PSR at ¶ 16.

27

28

**B.      Category VI Overstates the Severity of Criminal History**

As the PSR suggests, Category VI overstates the severity of Mr. Jefferson's criminal history. All four of the convictions were for automobile burglaries occurring during a period of approximately 17 months, from September 25, 2017 to April 7, 2019. Although each sentence was counted separately under the Criminal History calculations, Mr. Jefferson received concurrent terms for most of the convictions and later probation violations. Moreover, while automobile burglary is a serious crime, it is noteworthy that none of the offenses involved the use of violence or a weapon.

**C.      Youthfulness at Time of Offense**

Mr. Jefferson was only 22 years old at the time of his offense. Scientific studies have found that an individual's brain is not usually fully developed until one reaches the age of about 25. https://www.urmc.rochester.edu/encyclopedia/content.aspx?ContentTypeID =1&ContentID=3051. An individual's ability to curb impulses, resist external pressures, and consider consequences are still in the process of being formed during early adulthood. Moreover, young adults like Mr. Jefferson, who have suffered profound hardships while growing up, have even more difficulty regulating emotion, behavior, and impulsiveness.

Fortunately, as the Supreme Court noted, "'For most teens, [risky or antisocial] behaviors are fleeting; they cease with maturity as individual identity becomes settled. Only a relatively small proportion of adolescents who experiment in risky or illegal activities develop entrenched patterns of problem behavior that persist into adulthood.'" *Roper v. Simmons*, 543 U.S. 551, 570 (2005), quoting Steinberg & Scott, *Less Guilty by Reason of Adolescence: Developmental Immaturity, Diminished Responsibility, and the Juvenile Death Penalty*, 58 Am. Psychologist 1009, 1014 (2003). Most youth are able to improve their decision-making and planning skills as their immature brains develop. That certainly appears to be the case with Mr. Jefferson, who has not committed crimes and maintained employment during most of the time he has been on pretrial release.

**D.      Prior Traumatic Experiences**

Mr. Jefferson experienced several significant traumas in his life that likely have had

1   a deep impact on his psychological well-being. These include poverty, homelessness,

2   exposure to domestic violence, and the loss of loved ones. While on supervised release, Mr.

3   Jefferson will be able to receive therapy that will help him cope with the effects of these

4   traumas.

5           **E.**     **Learning and Intellectual Disabilities, Depression**

6   Since early childhood, Mr. Jefferson has suffered from significant learning and

7   intellectual disabilities. He has received SSI disability payments since age 4 and began

8   special education classes at age 6. In addition, he was diagnosed with Persistent Depressive

9   Disorder with an early onset. Because of these impairments, social functioning has been a

10   lifelong struggle for Mr. Jefferson.

11           **F.**     **Post-Offense Rehabilitation**

12   After spending 30 days in post-arrest custody at Santa Rita Jail, Mr. Jefferson was

13   released on an unsecured bond, under the supervision of Pretrial Services. During almost one

14   year of pretrial release, Mr. Jefferson had some difficulty with drug tests and location

15   monitoring, but he worked hard to secure and maintain employment. Now, after moving back

16   with his mother in Seattle, he is adjusting very well. He has also not committed any crimes

17   while on pretrial release.

18           **G.**     **Substance Abuse**

19   Prior to his arrest, Mr. Jefferson had problems with substance abuse. He used

20   marijuana daily and oxycodone two to three times per week. Moreover, drug use played a

21   role in Mr. Jefferson's offense. When the police approached the parked vehicle in which they

22   found the firearm, Mr. Jefferson was passed out in the front seat. After the officers woke

23   him, he said that he had used Xanax, which had caused him to fall asleep while driving. Mr.

24   Jefferson remains interested in ongoing substance abuse treatment to assist him with

25   maintaining sobriety.

26   **VI.   CONCLUSION**

27   Due to the many mitigating circumstances outlined above and in the PSR, the Court

28

1   should sentence Mr. Jefferson to time served followed by supervised release with electronic

2   home monitoring for one year and other conditions recommended in the PSR. Sentencing Mr.

3   Jefferson to additional imprisonment is not necessary to achieve the sentencing goals listed

4   in 18 U.S.C. § 3553(a). The sentence requested – consisting of a felony conviction and all

5   of its adverse consequences,  supervised release, location monitoring, and other conditions

6   – is significant punishment, especially for someone like Mr. Jefferson, who has never had

7   a federal conviction before. Additional incarceration, which will likely result in Mr. Jefferson

8   losing his job and undermine the progress he has made on pretrial release is not warranted.

9   DATED: December 3, 2021                          Respectfully submitted,

10

11

12                                          /s/ Mark Goldrosen
                                           MARK GOLDROSEN
                                           Attorney for Defendant
13                                         JEREMIAH JEFFERSON

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28